

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
06/03/2010

| | | |
|---|---|---|
| IN RE: | § | |
| **KELLEY LAVONE SIMMS-WILSON,** | § | **Case No. 07-34061** |
| Debtor(s). | § | |
| | § | **Chapter 13** |
| | § | |
| **KELLEY LAVONE SIMMS-WILSON; aka** | § | |
| **AUSTIN,** | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | **Adversary No. 09-03232** |
| | § | |
| **LINEBARGER GOGGAN BLAIR AND** | § | |
| **SAMPSON LLP,** *et al*, | § | |
| Defendant(s). | § | **Judge Isgur** |

## MEMORANDUM OPINION

For the reasons set forth below, the Court holds:

1. Defendants violated 11 U.S.C. § 525(b);

2. Simms-Wilson failed to prove damages from Defendants violation of § 525(b); and

3. Defendants did not violate 11 U.S.C. § 362.

Because Simms-Wilson failed to prove damages, judgment will be issued for the Defendants.

### Background

Kelly Lavone Simms-Wilson ("Simms-Wilson") filed for chapter 13 bankruptcy relief on June 18, 2007. Defendant[1] Linebarger, Goggan, Blair and Sampson, LLP ("Linebarger") filed proofs of claim in Simms-Wilson's bankruptcy case on behalf of its clients Fort Bend County and Lamar Consolidated Independent School District (collectively, "Fort Bend and Lamar") for delinquent ad valorem taxes. Simms-Wilson's bankruptcy plan was confirmed on March 25,

---

[1] Charles Sutton and Norman Nelson, partners at Linebarger, were also named, individually, as defendants.

2008 (Doc. No. 114) and included treatment (as secured claims) of the delinquent taxes owed to Fort Bend and Lamar for the 2006 and 2007 tax years.

In March 2009, while her bankruptcy case was still pending, Simms-Wilson interviewed for an associate attorney position with Linebarger.  The position entailed assisting in the representation of Linebarger's various Fort Bend County clients, including Fort Bend and Lamar, which are two of Linebarger's largest Houston clients.

Simms-Wilson was interviewed by Defendant Charles Sutton.  Sutton, who is a Linebarger partner, is responsible for overseeing Linebarger's ad valorem tax collection practice in the suburban Houston, Texas region (which includes Fort Bend County).  Nevertheless, Sutton was not personally involved in Simms-Wilson's bankruptcy case and had no knowledge of Simms-Wilson's delinquent taxes when Linebarger invited Simms-Wilson to the interview.

Sutton also did not learn of Simms-Wilson's delinquent taxes during the interview.  Simms-Wilson informed Sutton that she was raised and currently resided in Fort Bend County.  However, Sutton did not ask Simms-Wilson whether she owed any delinquent taxes to Fort Bend, Lamar, or any other tax agency.  Simms-Wilson also did not directly offer information regarding her delinquent taxes.[2]

Although she failed to raise the issue, Simms-Wilson did not intentionally conceal her personal tax issues from Sutton during the interview.  Simms-Wilson authorized Linebarger to check her credit history and Simms-Wilson was aware that attorneys from Linebarger had represented creditors in her bankruptcy case.  Thus, it was reasonable for Simms-Wilson to

---

[2] At least a portion of the attorneys at Linebarger were aware of Simms-Wilson's delinquent taxes and bankruptcy filing.  First, on February 21, 2008, Linebarger filed a tax suit against Simms-Wilson on Fort Bend and Lamar's behalf. *See Fort Bend County  vs. AustinI*, No. 08-DCV-162384 (400th Dist. Ct., Fort Bend County, Tex 2008.). The suit was dismissed by Linebarger due to Simms-Wilson's pending bankruptcy proceeding on April 23, 2008. Second, Linebarger filed multiple documents in Simms-Wilson's case, including proofs of claims and objections to the bankruptcy plan.

assume that Linebarger was aware—or could, at the very least, easily become aware—of her tax and bankruptcy situation.

Sutton offered Simms-Wilson the associate position with Linebarger in late March 2009; Simms-Wilson accepted the offer shortly thereafter.  Consistent with Linebarger's regular hiring practice, the firm did not perform a conflicts of interest "check" on Simms-Wilson at the time she was hired and did not inquire whether Simms-Wilson owed delinquent taxes.

Sutton became Simms-Wilson's supervisor and Simms-Wilson immediately began working on Linebarger's Fort Bend and Lamar cases, including those involving delinquent ad valorem tax collections.  Sutton testified that although he took issue with two minor aspects of Simms-Wilson's initial employment, he was pleased with Simms-Wilson's overall progress and had no complaints about her actual legal work in March and April of 2009.[3]

On April 17, 2009, unbeknownst to Sutton, Linebarger filed a proof of claim on behalf of Fort Bend and Lamar in the amount of $6,971.78 for delinquent 2008 ad valorem taxes in Simms-Wilson's bankruptcy case.  On April 28, 2009, the Court confirmed Simms-Wilson's modified chapter 13 plan. (Doc. No. 174).  The modified plan included Court authorization for Simms-Wilson to pay her 2008 ad valorem taxes in full directly to Fort Bend and Lamar within 20 days. (Doc. No. 170).  Simms-Wilson timely paid the 2008 delinquent taxes in accordance with the modified plan.

On the afternoon of Thursday, April 30, 2009, Sutton first became aware of Simms-Wilson's bankruptcy case and delinquent tax debts.  Sutton then informed Defendant Norman

---

[3] Sutton testified that, while Simms-Wilson was in need of some additional training, she was able to begin handling files and working on cases immediately upon her arrival at Linebarger.  Sutton's testimony further indicated that he was pleased with Simms-Wilson's legal work and with his decision to hire Simms-Wilson.  However, Sutton did complain that Simms-Wilson (i) spent too much time out of the office during working hours (presumably winding up cases she handled as an ad litem before joining Linebarger), and (ii) had interpersonal issues with at least one employee at Linebarger.

Nelson—Sutton's supervisor and a member of Linebarger's Management Committee—of Simms-Wilson's delinquent taxes that afternoon.

Upon receiving the news, Nelson responded that Simms-Wilson's debts violated Linebarger's "firm policy" against owing debts to Linebarger's clients.  Nelson and Sutton also discussed the potential embarrassment to which Linebarger could subject itself by employing an associate with delinquent taxes.  Nelson determined that Simms-Wilson's termination would likely be the necessary course of action, but instructed Sutton to first seek additional assistance from Linebarger's human resources department before making a final decision.  Nelson did not discuss any alternative measures that Linebarger could take to avoid terminating Simms-Wilson's employment.

On the following day, May 1, 2009, Sutton spoke to the human resources department about Simms-Wilson's situation.  After discussing the matter with an employment law attorney, the human resources department directed Sutton to terminate Simms-Wilson.

Near the end of the May 1, 2009 work-day, Sutton notified Simms-Wilson that it was against Linebarger's firm policy[4] for an employee to owe delinquent taxes to a client and, therefore, he had to terminate Simms-Wilson's employment with Linebarger.  Sutton informed Simms-Wilson that she never would have been hired if Sutton had known of Simms-Wilson's delinquent taxes when Simms-Wilson interviewed for the position.  Sutton further stated that Linebarger had lost clients in the past when less serious issues arose, and that Linebarger was

---

[4] Sutton admitted at trial that Linebarger does not have an explicit firm policy against hiring employees who owe delinquent taxes to firm clients.  Instead, according to Sutton, owing delinquent taxes to firm clients is against Linebarger's broad policy that an employee may not engage in conduct that is "injurious to the operational ability of the firm."  However, Sutton acknowledged that he is unaware of any instance (before this case) where Linebarger terminated an employee for owing debts to a client.  Sutton was also unaware of how employees are notified that it is against firm policy to owe delinquent taxes to firm clients.  Instead, the only examples Sutton produced of employee conduct "injurious to the firm" which has necessitated termination in the past concerned employee poor work performance and inappropriate appearance or demeanor in court.  Further, before this case, Sutton did not routinely check whether the employees he oversaw were delinquent on their tax debts.

fortunate to discover Simms-Wilson's delinquent taxes before a competitor for the firm's Fort Bend clients received the information.

Simms-Wilson then asked Sutton whether she could keep her job if she paid the delinquent taxes earlier than provided for in her bankruptcy plan. Sutton said he would consider Simms-Wilson's proposition and immediately consulted Nelson to determine whether this was acceptable. Nelson and Sutton determined that they would need more time to answer Simms-Wilson's question. Eventually, May 1, 2009 ended with Sutton: (i) deciding[5] not to terminate Simms-Wilson, and (ii) informing Simms-Wilson that Linebarger would also explore whether payment of the delinquent taxes was an option.

On Monday, May 4, 2009, Sutton consulted with Linebarger's bankruptcy department and was informed that Simms-Wilson would be unable to pay the delinquent taxes early. Sutton then made the decision to terminate Simms-Wilson's employment and explained this decision to Simms-Wilson that afternoon.[6] Sutton stated that the delinquent taxes created an impermissible conflict of interest between Simms-Wilson and Fort Bend and Lamar, which could not be remedied in the near future, and thus necessitated Simms-Wilson's immediate termination.

Bridgette Smith, who was Simms-Wilson's attorney at the time, sent a letter to Linebarger, Sutton and Nelson on May 5, 2009 informing the recipients that Simms-Wilson's termination violated §§ 362 and 525 of the Bankruptcy Code. (Pl.'s ex. F). The letter demanded that Linebarger rescind Simms-Wilson's termination and compensate her for damages.

---

[5] At trial, Sutton stated that he decided not to terminate Simms-Wilson because he "truly and honestly wanted to keep [Simms-Wilson] on as an attorney. The position was filled because it was an important position to be filled and [Sutton] had no desire to terminate [Simms-Wilson]."

[6] The Court notes that although it was Sutton who made the ultimate decision to terminate Simms-Wilson's employment, the decision was influenced by advice from Nelson, Linebarger's bankruptcy group, Linebarger's human resources director, and Linebarger's outside employment law counsel.

Linebarger's attorney responded to Ms. Smith on May 7, 2009. (Pl.'s ex. G).   The response stated that Simms-Wilson was terminated for violating a firm policy and because of the "irreconcilable ethical issue" associated with Simms-Wilson's representation of Fort Bend and Lamar.

On June 6, 2009, Simms-Wilson filed an adversary proceeding against Linebarger, Sutton and Nelson (collectively, the "Defendants") alleging violations of 11 U.S.C. §§ 362(a)(3), 362(a)(6) and 525(b)(3).  With regard to § 362, Simms-Wilson alleges that Defendants attempted to collect the delinquent taxes in violation of the automatic stay when Sutton informed Simms-Wilson that she was being terminated on May 1, 2009.  Simms-Wilson alleges that Defendants violated § 525(b)(3) because she was terminated "solely" because she owed delinquent taxes.

Defendants claim that they never attempted to collect the delinquent taxes and did not violate the automatic stay.  Further, Defendants claim that Simms-Wilson was not terminated "solely" due to her delinquent taxes but also because Simms-Wilson's representation of Fort Bend and Lamar created an impermissible conflict of interest.

The case went to trial on March 4, 2010.  After trial, the Court ordered briefing on the question of whether—since the delinquent 2008 taxes were a post-petition obligation—Simms-Wilson's 2008 taxes constitute a "debt that is dischargeable" under § 525(b)(3).

The Court ordered additional briefing of two issues on April 12, 2010. (Doc. No. 42).  First, the Court ordered the parties to submit a brief regarding the sufficiency of the evidence of damages presented at the March 4, 2010 trial.[7]  Second, the Court ordered briefing on the burden of proof regarding damages and mitigation.

---

[7] The Court found that the only evidence Simms-Wilson presented regarding damages was that her annual Linebarger salary was approximately $67,500.00.  The Court ordered the parties to brief whether this evidence was sufficient.

**Issues**

1.   Whether Simms-Wilson was terminated solely because she owed a debt dischargeable in bankruptcy in violation of 11 U.S.C. § 525(b)(3)?

2.   If Defendants did violate § 525(b)(3), what remedy should Simms-Wilson receive?

3.   Whether Defendants' conduct when terminating Simms-Wilson amounted to an attempt to collect the delinquent taxes in violation of §§ 362(a)(3) and (a)(6)?

**Jurisdiction**

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334.  This proceeding is core under 28 U.S.C. § 157(b).  Venue is proper in this District pursuant to 28 U.S.C. § 1409.

**Analysis**

**1.   Section 525(b)(3)**

Section 525(b)(3) provides, in relevant part, that "[n]o private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title . . . *solely* because such debtor or bankrupt . . . has not paid a debt that is *dischargeable* in a case under this title . . . ." 11 U.S.C. § 525(b)(3) (emphasis added).   Accordingly, the Court must address two separate prongs found in § 525(b)(3): (i) whether Simms-Wilson was terminated "solely" because of her delinquent taxes, and (ii) whether the delinquent taxes are a "debt that is dischargeable" in bankruptcy. *See In re Franceschi*, 268 B.R. 219, 225 (B.A.P. 9th Cir. 2001).

As set forth below, the Court finds that Simms-Wilson satisfies both prongs and was therefore terminated in violation of § 525(b)(3).

**a.   Simms-Wilson Satisfies § 525(b)(3)'s "Solely" Prong**

A plaintiff alleging a violation of § 525(b)(3) must prove that the sole reason the plaintiff was terminated was due to the plaintiff's failure to pay a dischargeable debt. *See Robinette v. WESTconsin Credit Union*, 2010 WL 681406, at *5 (W.D. Wis. Feb. 25, 2010). Thus, under the plain language of § 525(b)(3), if at least one additional factor played a role in the employer's decision to terminate the plaintiff, the plaintiff's § 525(b)(3) claim fails.[8] *See White v. Kentuckiana Livestock Mkt., Inc.*, 397 F.3d 420, 425-27 (6th Cir. 2005) (stating that the majority of courts adhere to the plain meaning of the term "solely," and finding in favor of the employer because multiple factors influenced the employer's termination decision); *In re Banner*, 422 B.R. 608, 612 (Bankr. N.D. Tex. 2009) (finding in favor of the employer because the employer had a reason, in addition to the employee's bankruptcy filing, for terminating the employee); *Everett v. Lake Martin Area United Way*, 46 F. Supp. 2d 1233, 1237 (M.D. Ala. 1999) ("The term 'solely' as used in the statute means what it says-i.e. that a person seeking relief under [§ 525(b)] for a termination must prove that the filing of a bankruptcy was the sole reason for termination.").

Furthermore, when determining an employer's motive for terminating an employee, courts usually must "look to the objective evidence presented and draw reasonable inferences from that evidence as to the subjective intent of the parties involved." *McKibben v. Titus County Appraisal Dist. (In re McKibben)*, 233 B.R. 378, 381 (Bankr. E.D. Tex. 1999). *See also In re Hopkins*, 66 B.R. 828, 833 (Bankr. W.D. Ark. 1986) (relying on "the circumstances surrounding the debtor's termination" for "clearly establish[ing]" that the "decision to fire the debtor was based solely on her bankruptcy filing").

As set forth below, the Court finds that Simms-Wilson was terminated solely because she owed delinquent taxes to Fort Bend and Lamar.

---

[8] Plaintiff has the burden to prove she was terminated for a discriminatory purpose in violation of § 525(b). *Bell v. Sanford-Corbitt-Bruker, Inc.*, 1987 WL 60286, at *4 (S.D. Ga. Sept. 14, 1987). Once plaintiff satisfies the burden, it shifts to defendant to prove a legitimate, non-discriminatory reason for defendant's actions. *Id.*

### i. Simms-Wilson was Terminated Because She Owed a Debt

There was an abundance of evidence presented at trial illustrating that Simms-Wilson was terminated because she owed delinquent taxes to Linebarger's Fort Bend clients.  This conclusion is particularly inescapable upon review of the statements made and actions taken by Sutton and Nelson between April 30, 2009 and May 4, 2009.

Sutton—Simms-Wilson's immediate supervisor who was ultimately responsible for hiring and terminating Simms-Wilson—unambiguously indicated that he had no desire to terminate Simms-Wilson.  Sutton stated that he was pleased with Simms-Wilson's legal work and that she was performing an important job for Linebarger.  Sutton even attempted to retain Simms-Wilson after initially terminating her employment on May 1, 2009.  As soon as Simms-Wilson proposed a potential option in the alternative to termination—i.e. the payment of the delinquent taxes—Sutton retracted (at least for the time being) Simms-Wilson's termination.  Sutton's actions, therefore, clearly show that the delinquent taxes were the only barrier to Simms-Wilson's continued employment with Linebarger.

 Nelson's testimony provides numerous, additional examples which illustrate that the delinquent taxes were at least the primary factor influencing Simms-Wilson's termination.  First, when asked by Simms-Wilson at trial, Nelson admitted that but for the delinquent taxes, Simms-Wilson would not have been terminated.  Second, Nelson unequivocally stated that Simms-Wilson's delinquent debt would have been an embarrassment which could have cost Linebarger the Fort Bend and Lamar accounts.  Third, Nelson admitted that Simms-Wilson would likely be eligible for re-hire with Linebarger once she satisfies her delinquent taxes.  Fourth, except for Simms-Wilson's proposal to pay the debt early, Nelson admitted that he did not consider any

alternative measures to termination.  All four of Nelson's statements clearly indicate that Simms-Wilson was terminated because she owed delinquent taxes.

The Court's conclusion is further supported by testimony from both Sutton and Nelson regarding Linebarger's policy forbidding employees from owing debts to a client.  Both witnesses unequivocally stated that Simms-Wilson was terminated because her debts to Fort Bend and Lamar violated Linebarger policy.  The policy against owing certain types of debt—even if strictly enforced against employees outside of bankruptcy—may not contravene the Bankruptcy Code.  The Linebarger policy does not provide an additional factor to support Simms-Wilson's termination.  To the contrary, the Defendants' application of the policy towards Simms-Wilson reinforces the finding that Simms-Wilson was terminated because of her delinquent taxes.

On a related point, it is noteworthy that Linebarger's debt policy was practically nonexistent before this case arose.  Neither Nelson nor Sutton, who have each worked at Linebarger for over 15 years, could articulate even one instance in which an attorney was terminated for debts owed to a client.  They both also admitted that Simms-Wilson was never explicitly notified of the policy, and that they were unaware of the existence of any formal mechanism used by Linebarger to inform employees of the policy.  Sutton's testimony indicates that the only way the employees could learn of the policy was by implication, through Linebarger's broader, explicit policy that employees may not engage in conduct injurious to the operational ability of the firm.  The Court finds that the practical nonexistence of the debt policy at Linebarger underscores the role Simms-Wilson's debt played in her termination.  It illustrates that it was not so much a policy violation, but simply the existence of the delinquent taxes

(which could embarrass the firm and harm its relationship with Fort Bend and Lamar), which precipitated her termination.

### ii. Defendants Fail to Show an Additional Factor Influenced Simms-Wilson's Termination

Simms-Wilson has satisfied her burden to prove that she was terminated for a discriminatory purpose, namely, her delinquent Fort Bend and Lamar taxes. *See Bell*, 1987 WL 60286, at *4. Accordingly, the burden now shifts to Defendants to prove a legitimate, non-discriminatory reason for their termination decision. *Id.*

Defendants argue that Simms-Wilson's termination was proper—and not "solely" because of Simms-Wilson's delinquent taxes—because retaining Simms-Wilson created an impermissible ethical conflict of interest. Defendants take the position that Simms-Wilson's termination was separate and distinct from her bankruptcy issues[9] and was a necessary action to remedy the conflict. Defendants state that "the termination was required by the conflict the debt created, not the tax debt. Had the conflict been created by some previous representation, for instance, and not a debt, the end result, termination, would have been the same." (Def.'s Br. 12).

In support of their argument, Defendants rely on Rule 1.06(b)(2) of the Texas Disciplinary Rules of Professional Conduct ("TDRPC"), which provides, in pertinent part, a "lawyer shall not represent a person if the representation of that person . . . reasonably appears to be or become adversely limited by the lawyer's . . . own interests." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(b)(2). Defendants state that Simms-Wilson could not have ethically and zealously collected taxes for Fort Bend and Lamar due to her personal, delinquent tax debt to those entities, which was in excess of $10,000.

---

[9] For example, in the May 7, 2009 letter from Defendants' attorney to Simms-Wilson's attorney, Defendants' counsel stated "[a]ny connection to bankruptcy at this point is, at most, tangential. Your client was an *at-will* employee, terminated for a violation of a Firm policy. She was not terminated because she filed for bankruptcy." (Pl.'s ex. H) (emphasis original).

### 1. Defendants Failed to Properly Address the Alleged Conflict

The Court recognizes that an alleged impermissible ethical conflict might require the Court to consider whether a judicially crafted exception to the anti-discrimination provisions of § 525 would be appropriate.  However, Defendants' conduct in this case does not raise a sufficient equitable concern for the Court to give serious consideration to any exception to § 525's plain meaning.

Defendants made no attempt to determine if they could simultaneously accommodate Simms-Wilson's bankruptcy status and their ethical concerns.  Defendants did not investigate whether a "Chinese Wall" could be imposed to separate Simms-Wilson from Linebarger's representation of Fort Bend and Lamar in her personal bankruptcy case. *See In re Nat'l Century Fin. Enters. Inc. Fin. Inv. Litig.*, 2010 WL 1257598, at *10 (S.D. Ohio Mar. 29, 2010) ("Chinese walls are used to ensure that an attorney has no contact with the attorneys litigating the matter that presents a potential conflict.").  *See generally Burgess-Lester v. Ford Motor Co.*, 643 F. Supp. 2d 811, 813-15 (N.D. W. Va. 2008).  Defendants also did not consider placing Simms-Wilson on non-Fort Bend and Lamar accounts or transferring Simms-Wilson to a different office that did not handle Fort Bend and Lamar cases.[10]  And, as discussed below, Defendants did not ask Fort Bend and Lamar to waive the potential conflict.

Moreover, the Court has serious doubts as to the bona fides of the alleged ethical concerns in this case.  Obviously, Simms-Wilson could not represent Fort Bend and Lamar in her own case.  Beyond that single limitation, this Court does not understand how the representation of Fort Bend and Lamar would be limited by Simms-Wilson's own interests.  Put simply, the

---

[10] This option is particularly interesting in this case because Linebarger terminated another attorney (who did not represent Fort Bend) right before Simms-Wilson was terminated.  Defendants claim that they were under a hiring freeze at the time the other associate was terminated and, therefore, they were unable to transfer Simms-Wilson to the position.  The Court is not persuaded by this argument: As stated above with regard to the policy against delinquent debt, a firm's internal policy does not excuse violation of the Bankruptcy Code.

ethical predicate for the termination does not appear to be present.  Every property-owning resident of Fort Bend County has the inchoate conflict that the person owes taxes to the County. To the extent that such an inchoate conflict would restrict a lawyer's ethical responsibilities to Fort Bend and Lamar, then Sutton, who also lives in Fort Bend County, would be ineligible to work at the firm.  There is nothing inherent in the existence of a delinquent account that makes such representation any more problematic.

### 2.   Defendants Failed to Consider Rule 1.06(c)

To the extent that an ethical conflict does exist, Defendants' argument is a red herring, indivisible from Defendants' true motive for terminating Simms-Wilson, which was to quickly extinguish a potentially embarrassing and costly issue. *See McKibben*, 233 B.R. at 381 (courts may evaluate objective evidence to determine true, subjective motive of employer).  TDRPC Rule 1.06(b)(2), the foundation for Defendants' theory, is limited by Rule 1.06(c), which provides, in pertinent part, that a "lawyer may represent a client in the circumstances described in [Rule 1.06(b)]" if:

> (1) the lawyer reasonably believes the representation of each client will not be materially affected; and
>
> (2) each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(c).  At trial, while relying heavily upon Rule 1.06(b)(2), Defendants were unable to explain why they did not pursue Rule 1.06(c)'s consent option before terminating Simms-Wilson.

Simms-Wilson reasonably believed that she could represent Fort Bend and Lamar. Simms-Wilson has been practicing law since 2003.  Sutton had no complaints about Simms-Wilson's representation of Fort Bend and Lamar during her six weeks at Linebarger and testified

that he had no desire to terminate her.  Thus, even assuming that Rule 1.06(b)(2) applies, Simms-Wilson would have been ethically permitted to represent Fort Bend and Lamar if she had received their consent to the representation.

However, Defendants terminated Simms-Wilson before there was any opportunity for Simms-Wilson or Linebarger to seek Fort Bend and Lamar's Rule 1.06(c) consent.  On May 1, 2009, the first time Sutton confronted Simms-Wilson, Sutton told her that she had violated Linebarger policy by owing money to a client.  At that point, there was no reason for Simms-Wilson to seek Fort Bend and Lamar's consent under Rule 1.06(c) because the ethical issue had not been raised in Simms-Wilson's presence.   Sutton simply told Simms-Wilson that her delinquent taxes (i) violated a Linebarger policy, (ii) would have prevented her from being hired by Sutton, and (iii) could embarrass Linebarger and benefit a competing law firm.  Thus, seeking Fort Bend and Lamar's consent under Rule 1.06(c) would not remedy the problem Simms-Wilson faced on May 1, 2009 and could have exacerbated it by bringing outside attention to a potentially embarrassing issue.  Simms-Wilson could only come into compliance with the firm policy by paying the debt and Simms-Wilson took steps to do exactly that when she asked Sutton whether she could keep her job by paying the debt.  Sutton's response—that they should both look into whether paying the debt early was possible—gave Simms-Wilson hope that the entire issue could quickly be resolved internally.[11]

It was not until May 4, 2009 that Sutton told Simms-Wilson she was being terminated because of an impermissible ethical conflict.  At that point, it was too late for Simms-Wilson to

---

[11] Furthermore, even if the ethical issue had been raised on May 1, 2009, it was reasonable for Simms-Wilson to first see if she could pay the debt early before seeking Fort Bend and Lamar's consent under Rule 1.06(c). For, if she paid the debt early, Simms-Wilson would have essentially killed two birds with one stone—it would have rectified the ethical conflict and brought Simms-Wilson into compliance with Linebarger's debt policy. Whereas, if Simms-Wilson sought Fort Bend and Lamar's consent but didn't repay the debt, she would still have been in violation of firm policy and subject to termination.

seek Rule 1.06(c) consent because she was terminated as soon as she was informed of the existence of the conflict.

There was no testimony offered at trial indicating that, between April 30, 2009 and May 4, 2009, Defendants ever considered asking Fort Bend and Lamar to consent to Simms-Wilson's representation.  In fact, Sutton and Nelson's testimony illustrates their desire to keep Fort Bend and Lamar in the dark about Simms-Wilson's employment.  Sutton told Simms-Wilson that he would not have hired her if he knew about her delinquent taxes and that Linebarger had previously lost clients when less serious problems had arisen.  Sutton and Nelson both stated that they were concerned Linebarger would lose Fort Bend and Lamar's business if they learned about Simms-Wilson's delinquent taxes.  Nelson also admitted that he never made an effort to determine whether the conflict could be resolved but simply concluded that the conflict was irresolvable.  Similarly, Sutton acknowledged that he never suggested to Simms-Wilson that she should seek Fort Bend and Lamar's consent and never presented Simms-Wilson with the opportunity to do so.

In sum, Sutton learned of Simms-Wilson's tax issue on April 30th and terminated her less than two business days later.   During that period, Simms-Wilson had very little, if any, opportunity to seek Fort Bend and Lamar's consent.  Similarly, but for Sutton's amenability to Simms-Wilson paying the delinquent taxes early, Defendants made no effort to resolve the conflict before terminating Simms-Wilson.  These facts lead to one conclusion: Defendants terminated Simms-Wilson because of the sensitive issues created by her delinquent taxes and not because such taxes created a conflict of interest.

### 3.  Rule 1.06(c)'s Comment 7 does not Excuse Defendants' Actions

Defendants nevertheless claim that Comment 7 to Rule 1.06(c) excuses their failure to seek (or to provide Simms-Wilson with the opportunity to seek) Fort Bend and Lamar's consent. Comment 7 provides that "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved should not ask for such agreement or provide representation on the basis of the client's consent." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(c) cmt. 7.

The Court is not persuaded by Defendants' reliance upon Comment 7.  First, the Linebarger attorneys involved in the termination were not disinterested.  Their behavior indicates they had an interest in keeping Fort Bend and Lamar as clients and felt that the potentially embarrassing tax situation would hinder their ability to do so.  The speed with which Simms-Wilson was terminated underscores this point.  Defendants wanted to resolve the problem as quickly as possible—before either Fort Bend and Lamar or a Linebarger competitor discovered the issue—and hardly stopped to consider whether more rational long-term solutions existed. Thus, Defendants were not disinterested when they consulted Comment 7 and their testimony that they relied upon Comment 7 when terminating Simms-Wilson is irrelevant.

Second, Defendants failed to present any evidence that they sought the advice of an outside, disinterested attorney regarding the Comment 7 issue.[12]  Although they were not required to present it, evidence that an outside attorney conducted an independent analysis and determined that Fort Bend and Lamar should not consent to the representation would have added support to Defendants' position.

---

[12] The Court notes that the Defendants did seek assistance from outside employment counsel before terminating Simms-Wilson.  The Defendants nevertheless failed to present evidence that the outside counsel was specifically consulted on the Comment 7 question.  To the contrary, the evidence suggests that, like Linebarger, the outside counsel focused upon Rule 1.06(b) and did not fully address Rule 1.06(c). (See Pl.'s ex. G).

Third, Nelson admitted that he did not take steps to determine whether the conflict could be resolved before terminating Simms-Wilson.  Given this testimony, which the Court found credible, the Court concludes that to the extent Rule 1.06(c) and Comment 7 were reviewed before Simms-Wilson was terminated, the review was cursory and insufficient.  Accordingly, the Court is not persuaded by Defendants' Comment 7 theory.[13]

### iii.  Conclusion

Simms-Wilson proved that Defendants terminated her because Defendants were concerned that Fort Bend and Lamar would be displeased with her delinquent taxes.  Defendants failed to show that any additional factors influenced their termination decision.  Accordingly, the Court finds that Simms-Wilson was terminated solely because she owed delinquent taxes to Fort Bend and Lamar.

### b.  Simms-Wilson's Delinquent Taxes were Dischargeable in Bankruptcy

Since the Court finds that Simms-Wilson was terminated solely because of her delinquent taxes, the Court must next consider whether the delinquent taxes are a "debt that is dischargeable" in bankruptcy.  *See* 11 U.S.C. § 525(b)(3).  In determining what constitutes a "dischargeable" debt, the Court's analysis begins with 11 U.S.C. § 1328, the chapter 13 discharge provision.  Section 1328 provides, in pertinent part:

> (a) Subject to subsection (d), as soon as practicable after completion by the debtor of all payments under the plan . . . *the court shall grant the debtor a discharge of all debts provided for by the plan* or disallowed under section 502 of this title, except any debt--
>
> > (1) provided for under section 1322(b)(5);

---

[13] The Court also notes that a disinterested attorney could have determined that Simms-Wilson's case did not fall within the scope of Comment 7.  Simms-Wilson was treating her 2006 and 2007 delinquent taxes under her bankruptcy plan and Simms-Wilson paid the delinquent 2008 taxes outside of her plan.  So long as Simms-Wilson continued making her monthly trustee payments, Simms-Wilson's personal tax situation with Fort Bend and Lamar was largely a non-issue.  Thus, a disinterested attorney could have concluded that Fort Bend and Lamar were capable of consenting to Simms-Wilson's representation in all cases but her own.

(2) of the kind specified in section 507(a)(8)(C) or in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8), or (9) of section 523(a);

(3) for restitution, or a criminal fine, included in a sentence on the debtor's conviction of a crime; or

(4) for restitution, or damages, awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused personal injury to an individual or the death of an individual.

11 U.S.C. § 1328(a) (emphasis added).

Thus, under § 525(b)(3), the Court must inquire whether the delinquent taxes are dischargeable pursuant to § 1328. This involves a hypothetical inquiry because § 525(b)(3)'s use of the term "dischargeable"—instead of, for example, "discharge"—requires courts to consider whether the debt at issue was capable of being discharged in the employee's bankruptcy case.[14] *See U.S. v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989) (in interpreting bankruptcy statutes, if "the statute's language is plain, the sole function of the courts is to enforce it according to its terms"). *See also In re Taylor*, 252 B.R. 201, 207 (Bankr. N.D. Ala. 2000) ("The fact that the wording of section 525(c) includes debts that are 'dischargeable' instead of simply discharged debts [requires] a determination as to whether the loan will be or could be discharged in the bankruptcy case."), *rev'd on other grounds*, 263 B.R. 139 (N.D. Ala. 2001); *Johnson v. Edinboro State College*, 728 F.2d 163, 166 (3d Cir. 1984) (holding that no violation of § 525 occurs when discrimination is based upon non-dischargeable debt, but

---

[14] The Court further notes that § 525(b)(3)'s text prohibits discrimination based on a debt "that is *dischargeable* in a case under this title or that was *discharged* under the Bankruptcy Act." 11 U.S.C. § 525(b)(3) (emphasis added). If Congress intended to only prohibit discrimination based on debt discharged under the Bankruptcy Code, it surely could have done so. Congress's use of the term "dischargeable"—in the same sentence where Congress prohibited discrimination based on debt "discharged" under the Bankruptcy Act—clearly indicates that Congress meant to prohibit discrimination based on debt capable of being discharged under the Bankruptcy Code. *See U.S. v. 1.16 Acres of Land, more or less, situate in Cameron County, Tex.* 585 F. Supp. 2d 901, 907 (S.D. Tex. 2008) ("The use of different words within related statutes generally implies that different meanings were intended.") (quoting *United States v. Bean*, 537 U.S. 71, 76 n.4, 123 S. Ct. 584, 154 L. Ed. 2d 483 (2002)).

implying that discrimination based on dischargeable, as opposed to discharged, debt is prohibited).

Therefore, in this case, the Court must consider whether the delinquent taxes are a debt that Simms-Wilson was capable of (i) including in her bankruptcy plan, and (ii) receiving a discharge therefrom after successful completion of the bankruptcy plan.  As set forth below, the Court answers both questions in the affirmative.

### i.   2006 & 2007 Pre-Petition Taxes

Simms-Wilson incurred her 2006 and 2007 taxes before the filing of her bankruptcy petition.  There is no dispute that the 2006 and 2007 taxes were capable of being included in Simms-Wilson's bankruptcy plan. *See* 11 U.S.C. § 1322.  Any doubt as to the theoretical capability of their inclusion is brought to rest by the fact that Simms-Wilson's bankruptcy plan actually provided for payment of the delinquent taxes.

There is also no dispute that Simms-Wilson's 2006 and 2007 taxes were subject to discharge upon Simms-Wilson's successful completion of her bankruptcy plan.  The taxes constitute "debts provided for by the plan," and are not subject to any of § 1328(a)'s discharge exceptions.

Accordingly, the 2006 and 2007 delinquent taxes are dischargeable within the meaning of § 525(b)(3).

### ii.   2008 Post-Petition Taxes

The question of whether the 2008 delinquent taxes were dischargeable in Simms-Wilson's bankruptcy case is more complex because it involves post-petition obligations.  The Court's analysis begins with 11 U.S.C. §§ 1305(a)(1) and 1329(a)(1).  Section 1305(a)(1) provides, in relevant part, that government agencies may file proofs of claim "for taxes that

become payable to [the] governmental unit while the case is pending . . . ." 11 U.S.C. § 1305(a)(1). Although governmental entities are not required to file proofs of post-petition tax claims, doing so in accordance with § 1305(a)(1) enables them to seek payment from a debtor's chapter 13 plan. *In re Parffrey*, 264 B.R. 409, 413 (Bankr. S.D. Tex. 2001). Furthermore, § 1329(a)(1) provides that "at any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor . . . to . . . increase or reduce the amount of payments on claims of a particular class provided for by the plan." 11 U.S.C. § 1329(a)(1). This section enables debtors to, among other things, modify their bankruptcy plans in order to treat post-petition claims filed under § 1305(a)(1). *See In re Owens*, 2010 WL 730717, at *1 (Bankr. E.D.N.C. Feb. 25, 2010). Thus, once a governmental unit files a proof of claim under § 1305(a)(1), a chapter 13 debtor becomes capable of including the tax claim in a modified bankruptcy plan according to § 1329(a)(1).

In this case, Fort Bend and Lamar filed a proof of claim in Simms-Wilson's bankruptcy case for delinquent, post-petition 2008 taxes on April 17, 2009. Accordingly, on April 17, 2009, the 2008 taxes became a dischargeable debt pursuant to § 525(b)(3) because once the proof of claim was filed, the 2008 taxes were capable of inclusion in a modified bankruptcy plan.

This conclusion is unchanged by the fact that Simms-Wilson actually paid the 2008 taxes directly to Fort Bend and Lamar, instead of through the bankruptcy trustee. Defendants argue that since the 2008 taxes were not actually provided for by Simms-Wilson's bankruptcy plan and paid by the trustee, they are not dischargeable under § 1328(a). Defendants' argument misconstrues § 525(b)(3)'s interplay with § 1328(a). As set forth above, the proper focus of the dischargeability inquiry is not upon whether the debt was actually provided for by the bankruptcy plan, but whether the debt could have been treated under the plan. Defendants'

argument fails because Simms-Wilson's 2008 taxes could have been paid to Fort Bend and Lamar by the trustee pursuant to a bankruptcy plan.[15]

Furthermore, as a secured tax claim, none of § 1328(a)(1)'s discharge exceptions are applicable to the 2008 taxes.  Thus, had Simms-Wilson modified her plan to include the 2008 delinquent taxes, the taxes would have been subject to discharge under § 1328(a)(1).

Accordingly, the 2008 delinquent taxes are dischargeable within the meaning of § 525(b)(3).

## 2.  Remedy for Violation § of 525(b)(3)

The Court must next consider the appropriate remedy for Defendants' violation of § 525(b)(3).  Simms-Wilson seeks actual damages, punitive damages and attorney's fees. (Pl.'s Compl. ¶ 27).

Section 525(b) does not state any potential remedies. *See In re Hicks*, 65 B.R. 980, 984 (Bankr. W.D. Ark. 1986).  Courts have nevertheless crafted remedies for § 525 violations with guidance from various provisions of the Bankruptcy Code.[16] *See Taylor*, 252 B.R. at 210 (awarding damages for emotional distress based on § 105, with guidance from § 362, for defendant's violation of § 525(c)); *In re Hicks*, 65 B.R. 980, 984 (Bankr. W.D. Ark. 1986) (ordering reinstatement for § 525(b) violation based on § 105 but denying request for attorney's fees); *In re Hopkins*, 81 B.R. 491, 495 (Bankr. W.D. Ark. 1987) ("In seeking guidance for an appropriate remedy for § 525(b) discrimination by a private employer, the Court has looked to general principles of federal job discrimination law, particularly [Title VII] and [the ADEA].");

---

[15] Defendants' theory also fails under the Fifth Circuit's *Foster* decision.  *See Foster v. Heitkamp (In re Foster)*, 670 F.2d 478, 485-86 (5th Cir. 1982).  *Foster* held that all payments made to creditors during a chapter 13 case, whether from the trustee or directly from the debtor, are made pursuant to the bankruptcy plan. *Id.*  Thus, according to *Foster*, Defendants' theory that Simms-Wilson's 2008 taxes were not "dischargeable" because Simms-Wilson made the payment directly to Fort Bend is a non-sequitur; the direct payment is still considered a payment under the plan.

[16] Reinstatement is a potential remedy for a § 525(b) violation. *Hicks*, 65 B.R. at 984.  However, Simms-Wilson has not sought reinstatement and, therefore, the Court need not address reinstatement in this case.

*Bell*, 1987 WL 60286, at *5 (awarding plaintiff damages for lost wages and emotional distress due to defendant's § 525(b) violation but failing to state any authority supporting such an award); *In re Oksentowicz*, 324 B.R. 628, 631 (Bankr. E.D. Mich. 2005) (relying on § 362(h)'s mitigation requirement for denying plaintiff's request for damages from defendant's alleged § 525(a) violation).

### a. Motion to Strike

As a preliminary matter, the Court must address Defendants' Motion to Strike Plaintiff's Damages Brief. (Doc. No. 47).  On April 12, 2010, the Court ordered the parties to brief the sufficiency of the evidence presented at trial and the burdens of proof regarding damages and mitigation. (Doc. No. 42).  With regard to sufficiency of the evidence, the order stated that the only evidence introduced at trial concerning damages was the fact that Simms-Wilson's salary was approximately $67,500.[17]

The parties submitted briefs on May 3, 2010 (Doc. Nos. 44 & 45) and Defendants filed their Motion to Strike on May 7, 2010.  Defendants' motion argues that Simms-Wilson's brief should be stricken in its entirety because it went beyond the scope of the Court's briefing order.[18] (Def.'s Mot. Strike 3).  In particular, Defendants state that "Plaintiff's brief impermissibly referenced (and offered) multiple exhibits and 'evidence' that were not introduced at trial." *Id.* at 3.  Defendants point out that Simms-Wilson filed over 100 pages of evidence as attachments to her brief, most of which dealt with damages evidence that was not introduced at trial.  Defendants claim that Simms-Wilson submitted this evidence because she realized that the

---

[17] This order likely put Simms-Wilson on-notice that the evidence of damages presented at trial was sparse.

[18] Defendants also argued that the case should be dismissed due to Simms-Wilson's noncompliance with the Court order.  The Court is not persuaded that Simms-Wilson's conduct merits dismissal. *See First Gen. Res. Co. v. Elton Leather Corp.*, 958 F.2d 204, 206 (8th Cir. 1992).  Accordingly, the Court denies the Defendants' motion to dismiss.

evidence submitted at trial was insufficient to prove damages and took advantage of the briefing opportunity to insert additional evidence into the record.

The Court grants Defendants' Motion to Strike.   Nothing in the April 12th order authorized or requested additional evidence.  The order simply dealt with the question of whether the evidence submitted was legally sufficient.   The additional evidence Simms-Wilson improperly submitted confused and misled the Court.  The Court was forced to review the trial record to determine whether the evidence discussed in the brief was actually admitted.

Simms-Wilson had the opportunity to testify and present additional damages evidence at trial but chose not to do so.  She may not have a second bite at the apple at this time.  Simms-Wilson has been a practicing attorney since 2003 and should have known better than to improperly submit additional damages evidence.  Accordingly, Simms-Wilson's brief is stricken in its entirety.

### b.   Simms-Wilson's Request for Actual Damages is Denied

The only evidence Simms-Wilson presented at trial concerning damages was that she was hired by Linebarger at an annual salary of approximately $67,500.00.  The question the Court must decide is whether the salary of a terminated employee, alone, is sufficient evidence for a damages finding.  The case-law leads to the conclusion that such evidence is insufficient.

In *McKibben*, for example, the bankruptcy court calculated the plaintiff's damages for lost wages according to the amount of time the plaintiff was unemployed. *McKibben*, 233 B.R. at 385.  The court found that the plaintiff's annual salary at the time of termination was $42,650.00 and that the plaintiff was unemployed for 636 days. *Id.*  The court then awarded $89,812.00 in lost wages, which amounted to the plaintiff's full salary for the period in which she was unemployed. *Id.*

In *Taylor*, the district court reversed the bankruptcy court's $12,000 damages award because the plaintiff failed to show actual damages.[19] *Taylor*, 263 B.R. at 153. *Taylor* based its decision upon the fact that the plaintiff had "no provable medical damages" and "suffered no financial consequences" as a result of the defendant's § 525(c) violation. *Id.*

Based upon *McKibben* and *Taylor*, the Court finds that Simms-Wilson has failed to prove she suffered damages.  Both cases demonstrate that a § 525 plaintiff must present evidence that enables the Court to calculate damages.  Here, the only evidence presented was Simms-Wilson's salary; thus, lost wages are the only potential damages the Court could feasibly award.  However, the Court refuses to award lost wages because, unlike in *McKibben*, there was no evidence presented concerning the period in which Simms-Wilson was unemployed.  Simply put, Simms-Wilson failed to show she suffered any financial consequences from the termination.  Without evidence concerning Simms-Wilson's unemployment, the Court is unable to calculate or award any damages.

### c.  Simms-Wilson's Request for Punitive Damages is Denied

Assuming a plaintiff may receive punitive damages in a § 525(b) lawsuit through the application of § 362(k), the Court holds that Simms-Wilson is nevertheless not entitled to punitive damages.[20] *See Taylor*, 252 B.R. at 210 (using § 362 for guidance in determining damages in a § 525(c) case). *But see Stansberry v. Uhlich Children's Home*, 264 F. Supp. 2d 681, 691 (N.D. Ill. 2003) (finding that punitive damages are unavailable under § 525(b)); *Leary v. Warnaco, Inc.*, 251 B.R. 656, 659 (S.D.N.Y. 2000) ("There is no authority for an award of punitive damages or attorneys' fees under § 525(b)."). Section 362(k) provides:

---

[19] *Taylor* dealt with a § 525(c) violation; nevertheless, the Court finds that *Taylor* provides useful guidance in this § 525(b) case.

[20] The Court does not decide whether punitive damages are available under § 525(b).  Instead, the Court merely finds that, even if punitive damages are available, Simms-Wilson is not entitled to receive them in this case.

> (1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.
>
> (2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

11 U.S.C. § 362(k).  "Generally, an award of punitive damages requires a showing of egregious and intentional misconduct." *See Taylor v. Freeman's Furniture, Inc. (In re Taylor)*, 2009 WL 981916, at *5 (Bankr. E.D. Tenn. 2009).  In the § 362(k) context, courts may consider "(1) the nature of the creditor's conduct; (2) whether the creditor has the ability to pay damages; (3) the creditor's motives in violating the stay; . . . (4) whether there was any provocation by the debtor" and, (5) whether actual damages are sufficient to deter future illegal conduct. *Id.*

The Court finds that Defendants conduct was not sufficiently egregious to warrant punitive damages.

### d.  Simms-Wilson's Request for Attorney's Fees is Denied

Although courts have fashioned various remedies for § 525(b) violations, the majority of courts have rejected plaintiffs' requests for attorney's fees. *See Myers v. TooJay's Mgmt. Corp.*, 419 B.R. 51, 61 (M.D. Fla. 2009) ("[T]here is no provision for the award of attorney's fees under § 525(b) and the majority of courts to address this have held that attorney's fees are not authorized under the statute.") (citations omitted); *Pratt v. Phoenix Home Life Mut. Ins. Co.*, 285 B.R. 3 (D. Or. 2001) (relying on the Supreme Court rule that "absent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation" when holding that attorney's fees are not recoverable under § 525(b)) (quoting *Runyon v. McCrary*, 427 U.S. 160, 185, 96 S. Ct. 2586, 49 L. Ed. 2d 415 (1976)); *Hicks*, 65 B.R. at 984 (denying request for

attorney's fees because the statute failed to provide for such relief); *In re Sweeney*, 113 B.R. 359, 364 (Bankr. N.D. Ohio 1990).

In this case, Simms-Wilson failed to argue why she should be entitled to receive attorney's fees under § 525(b).  Accordingly, the Court follows the majority rule and holds that Simms-Wilson's request for attorney's fees is denied.  *See Robinette*, 2010 WL 681406, at *1 ("As to plaintiff's claim for punitive damages and attorney fees under § 525(b), plaintiff has failed to argue that the law would allow her to seek such relief under § 525(b), and there is no obvious support for that position.").

### 3.   Defendants did not Violate § 362

Simms-Wilson also alleges that Defendants violated §§ 362(a)(3) and (a)(6) of the automatic stay[21] when Sutton told her that she was being terminated because she owed delinquent taxes.   In essence, Simms-Wilson alleges that Sutton pressured her to pay the delinquent taxes early and, in so doing, violated the automatic stay.[22]

Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  Section 362(a)(6) bars "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6).

The Court finds that Defendants did not violate the automatic stay.  On May 1, 2009, Sutton terminated Simms-Wilson because she owed delinquent taxes to Fort Bend and Lamar.  Upon receiving the news, Simms-Wilson asked whether she could pay the taxes early in order to

---

[21] The various provisions of § 362(a), which comprise the automatic stay, taken together, ensure that "virtually any act attempting to . . . obtain property from the estate . . . is stayed once bankruptcy proceedings are commenced." *Arnold v. Garlock, Inc.*, 278 F.3d 426, 436 (5th Cir. 2001).

[22] Simms-Wilson also alleges that Sutton directly attempted to collect the taxes.  The Court finds this allegation is unsupported by the evidence presented at trial.  As set forth below, Sutton never told Simms-Wilson to pay the taxes; instead, it was Simms-Wilson who initially offered to pay the taxes early.

keep her job.  Sutton, who had no desire to terminate Simms-Wilson, responded that they should both take time to inquire whether Simms-Wilson's proposal to pay the taxes early was possible. This conversation does not amount to a violation of the automatic stay.  A debtor may not ask to pay a debt early and then claim that the stay is violated when the creditor (or a representative of the creditor) responds that they should both research the issue.

Furthermore, Defendants ultimately concluded that Simms-Wilson could not pay the debt early and informed her of their conclusion on May 4, 2010.  Thus, not only did Defendants fail to attempt to collect the debt, but they actually told Simms-Wilson she could not pay the debt early. Accordingly, the Court finds that such conduct does not amount to a violation of the automatic stay.

## Conclusion

For the reasons set forth above, Defendants violated 11 U.S.C. § 525(b).  However, Simms-Wilson did not prove any damages from Defendants' § 525(b) violation.  Defendants did not violate 11 U.S.C. § 362.  A separate judgment will be issued.

SIGNED **June 3, 2010.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE